RICHARDS v. AMERICAN BANK OF ALASKA. *

(Circuit Court of Appeals, Ninth Circuit. July 3, 1916.)

No. 2440.

1. APPEAL AND ERROR ⊚⟶324—PERFECTION OF WRIT—DISMISSAL.
    Judgment was rendered against plaintiff in error and another on the
    theory that they were liable as partners. Plaintiff alone brought error,
    without obtaining or petitioning for a severance or giving any notice to his
    codefendant; but such codefendant filed an appearance in the Circuit Court
    of Appeals, stating that, had he been notified of the writ of error, he would
    have refused to join, that he waived any errors against him, and request-
    ing the court to pass on the merits of the writ, regardless of his supposed
    rights. *Held*, that the Circuit Court of Appeals had jurisdiction to pass
    on the writ, regardless of the fact that plaintiff in error did not serve no-
    tice upon or obtain a severance from his codefendant.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1806–
    1809; Dec. Dig. ⊚⟶324.]

2. TRIAL ⊚⟶252(15)—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.
    Plaintiff in error, defendant below, delivered to his codefendant a sum
    of money to enable the latter to purchase a one-fourth interest in a mine;
    but there was no evidence that any general partnership for the acquisi-
    tion of the entire property existed, although it was understood that the
    two should be jointly interested in the share purchased. The codefendant,
    to purchase the whole mine, borrowed money, executing a note purporting
    to be an obligation of a firm composed of himself and plaintiff in error,
    and as a partner signed the latter's name. *Held*, that an instruction the
    jury should consider whether any partnership agreement, as alleged by the
    holder of the note, was made, and, if so, whether plaintiff in error's co-
    defendant was authorized to borrow money and bind the firm, was im-
    proper, not being authorized by the evidence.
    [Ed. Note.—For other cases, see Trial, Cent. Dig. § 605; Dec. Dig. ⊚⟶
    252(15).]

3. APPEAL AND ERROR ⊚⟶1066—REVIEW—HARMLESS ERROR.
    In such case, where it did not appear that the jury's finding was based
    on any ratification by plaintiff in error, the improper instruction was re-
    versible error.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220;
    Dec. Dig. ⊚⟶1066; Trial, Cent. Dig. § 558.]

In Error to the District Court of the United States for the Fourth
Division of the District of Alaska; Frederic E. Fuller, Judge.

Action by the American Bank of Alaska, a corporation, against
Edwin Richards and another. There was a judgment for plaintiff,
and the named defendant brings error. Reversed and remanded.

Richards was a miner on Dome creek, Alaska. Williams had been employed
by him, and in 1909 Williams and Johanson were working on a lay which had
been turned over to them by Richards. In August, 1910, Williams and Johan-
son quit working on the lay, owing Richards $600 or $700. In the spring of
1910 Williams was in correspondence with Boulton, who owned a one-half
interest in a lease on a mine on Flat creek, in the Iditarod country, about
1,100 miles distant from the Hot Springs country, where Williams and Rich-
ards were, and wished to sell one-half of his interest for $2,000. Shively and
Kennedy owned the other half interest. In September, 1910, Boulton sent a
telegram, addressed to Richards at Hot Springs: "Send $2,000 at once through
N. C. Fifty thousand at stake. Freeze-out game. Don't fail to see letter."
The message was meant for Williams. After discussing the matter with Wil-
liams, Richards finally told the latter that he would give him the money to go

down there, and Williams went, taking with him $2,500, which had been furnished by Richards. Williams went to the Iditarod country, deposited the money in his own name in the Miners' & Merchants' Bank, bought one-half of Boulton's one-half interest in the lay for $2,000, then decided to buy the Shively and Kennedy half at $4,500, was unable to get the money at the Miners' & Merchants' Bank, but, upon the representation that Richards was his partner, he got from the plaintiff bank, through its president, Hurley, $3,500. He gave the bank a note for the money, payable in 90 days, dated October 6, 1910, signed, "Richards & Williams by Ed Williams." Two weeks later, on October 24, 1910, Williams wrote Richards a letter, apologetic in its terms, saying: "How I got the money is the hardest part for me to tell. You may be angry, but I didn't do it with any selfish motive, or try to take advantage of the kindness you did for me." He went on to say that he had deposited the money with the plaintiff bank. "Mr. Hurley is the manager. I told him the money was yours. He told me, in case anything should happen me, unless I deposited it in yours and my name, you would have some trouble getting it, so I did as he advised, and signed the check 'Richards & Williams.' * * * Now, Dick, I had to sign the note 'Richards & Williams,' and I sincerely hope you won't be offended." Letters by mail took about 30 days to pass between Hot Springs and Iditarod. Shortly after writing that letter, Williams received from Richards a letter which the latter had written on September 21, 1910, in which he spoke of what he had learned concerning Boulton's lay, and said: "So, if you have not interested yourself in it, by the time you get these lines, I would advise you to call it off as far as I am concerned. Keep enough money to secure yourself, and return balance to my credit at N. C., Hot Springs." In answer to the letter of October 24th, Richards on December 8, 1910, wrote to Williams expressing his surprise, and among other things saying: "Regarding that account at the bank in both our names, that is certainly a mistake. When I gave you a check for the money, and you get a letter of credit on it, my name should not be used at the bank. I never had the least idea you should assume any obligations beyond what would relieve the situation. * * * Well, now, Ed, to make this short, I believe the best way out of this, you should try and get some of those moneyed fellows down there to go in with you. Consider me out of it altogether. * * * You are perfectly welcome to use that money until you can make it." On December 16th Richards wrote a letter to Williams, in which he stated that he would not be responsible for any note, check, or other written instrument to which Williams might have signed his name in the Iditarod country. On December 26, 1910, Richards wrote to Williams, saying: "Certainly I am not going to worry anything about. Since you put the money into it, go to it and make something out of it. I imagine the proposition must be all right. * * * As you know, I looked at the thing to be of mutual advantage to both of us, but I did not calculate on putting more money than what you had." The note fell due in January, 1911. Williams was unable to pay it. He told Hurley that Richards did not want to stay in the transaction; that he would have to get other partners. He finally made a sale of a one-half interest to McKenzie and McLellan. On February 24, 1911, on the insistence of Hurley, Williams made the plaintiff a mortgage on the three-quarters interest in the lease, and executed a new note for $3,500, which he signed: "Edward Williams. Edwin Richards, by Edward Williams, His Attorney in Fact." He had no power of attorney from Richards, and no express authority to sign his name to the instrument. In fact, Richards knew nothing of the new note until December 28, 1911. Williams had written him, however, that the original note, if not paid when due, must be renewed. On January 2, 1912, Richards wrote the plaintiff bank, denying the authority of Williams to sign the note. An action was brought on the note the following September, which after three trials resulted in a verdict for the plaintiff, the substance of which is that the jury found that there is due, owing, and unpaid from the defendants to the plaintiff the sum of $3,500, principal on the note, together with no interest thereon, together with an attorney's fee for plaintiff's attorneys in the sum of $750. At that time there was $1,295 interest due on the note. Judgment was entered that the plaintiff recover from the defendants as copartners, and from Richards as an individual, $3,500, and the attorney's fee of $750; that the plaintiff recover from defend-

ant Williams as an individual $3,500, with interest thereon from February 24, 1911, at 12 per cent. per annum, amounting to $1,312.50, the judgment against Williams having been taken by default.

Louis K. Pratt and Thomas A. Marquam, both of Fairbanks, Alaska (Metson, Drew & MacKenzie and E. H. Ryan, all of San Francisco, Cal., of counsel), for plaintiff in-error.

Charles J. Heggerty, of San Francisco, Cal., Thomas McGowan and John A. Clark, both of Fairbanks, Alaska, and Knight & Heggerty, of San Francisco, Cal. (McGowan & Clark, of Fairbanks, Alaska, of counsel), for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] The defendant in error moves to dismiss the writ of error on the ground that the judgment sought to be reviewed is a joint judgment against two copartners, and that the plaintiff in error alone, and without obtaining or petitioning for a severance or giving any notice to his codefendant, sued out the writ of error. In Masterson v. Herndon, 10 Wall, 416, 19 L. Ed. 953, the court, through Mr. Justice Miller, said:

"We do not attach importance to the technical mode of proceeding called summons and severance. We should have held this appeal good if it had appeared in any way by the record that Maverick had been notified in writing to appear, and that he had failed to appear, or, if appearing, had refused to join."

And the learned justice, referring to the rule that without summons and severance an appeal must be dismissed, declared the reason therefor to be that with such summons and severance the court below would be enabled to execute its decree so far as it could be executed on the party who refused to join in the appeal, and that party would be estopped from bringing another appeal for the same matter, and said:

"The latter point is one to which this court has always attached must importance."

In the present case both grounds for dismissal have been obviated by the appearance which Williams, the codefendant with the plaintiff in error in the court below, has filed in this court. In that paper Williams states that, even if his codefendant had notified him of his purpose and intention to prosecute a writ of error to review the judgment, with a request that he join him, he would have refused so to join, and he states that he waives and releases any and all errors that may have been committed in the court below during the progress of the trial, and he asks this court to pass upon the merits of the said writ of error without any reference to any supposed rights he may ever have had in connection with the action and the record and proceedings therein. This we think is a sufficient appearance in the case to entitle this court to proceed. In Hill v. Western Electric Co., 214 Fed. 243, 130 C. C. A. 613, the Circuit Court of Appeals for the Sixth Circuit held that, where the omitted party to the appeal entered

his appearance, waived notice of the appeal, and submitted himself to the jurisdiction of the court as fully as though he had been duly and formally cited, and also waived time for filing brief "and other proceedings," he thereby became a party to all intents and purposes as though originally joined. The motion to dismiss must be denied.

[2] Error is assigned to the following instruction to the jury:

"You should consider, therefore, whether or not the defendants Williams and Richards entered into any partnership agreement as alleged by the plaintiff, and whether or not, if you find that they did enter into such agreement, it was contemplated thereby that said Williams should have authority to borrow money for the purposes of such partnership, and whether or not the moneys borrowed by him from the plaintiff were for such purposes."

The complaint had alleged that Williams and Richards were a mining copartnership, engaged in business in the Iditarod district. The answer denied the allegation. There was no evidence that a partnership agreement was ever entered into. In fact, the evidence was that no such agreement was made. If a partnership existed, it must be inferred from facts and circumstances, from the fact that the money was advanced by Richards to Williams, and it was agreed that Williams was to "go down there" and use his own judgment as to making the purchase. From these facts, and from expressions used by both in the correspondence which followed, it would appear that there was a tacit understanding that they should be jointly interested in a quarter interest in Boulton's lease. Williams, who was the principal witness for the plaintiff, testified as follows:

"Q. Did you have any conversation with Richards at any time after getting this telegram from Boulton, between that and the time you left, that you would go down there and buy a quarter interest, or any interest, with Boulton, and take the assignment of the lease in the name of yourself and Mr. Richards? A. No, sir. Q. Did you have any conversation with him, or did you have any verbal contract, or any written contract, that you would go down there and buy into that lease on Flat Creek, and that he and you would mine there as copartners during the summer of 1911? A. No, sir. Q. Was there anything said between you—now I am talking about down there at Hot Springs and before you left—about any partnership name? A. No; there was not. Q. Was there anything said about you going down there and putting that money he had given you in a bank in the name of the partnership of Richards and Williams? A. No, sir. Q. Was anything said between you about dividing profits and losses of any business down there? A. No, sir. Q. Was there anything said between you about your buying anything with that $2,500, other than a quarter interest in the Boulton lease? A. I can't say we discussed about buying. I was just given the money and sent down there to use my own judgment."

The whole of the evidence in the case, and there is no evidence to the contrary, is that there was no thought, either by Richards or Williams, of a general copartnership. The utmost that can be claimed for the evidence is that their minds met upon a joint venture to purchase, and perhaps to operate as a mining copartnership, a one-fourth interest in the lease then held by Boulton. There was no thought of the possibility of purchasing any other interest than that one-fourth, nor was there any suggestion of giving to Williams power to borrow money. The money which Richards had given him was ample for the purpose they had in view—$2,000 for the purchase of the one-fourth

interest; $500 for Williams' expenses. There was no testimony, and no deducible inference from the evidence, which justified the submission to the jury of the question whether it was contemplated by the agreement that Williams should have authority to borrow money for the purpose of such partnership. The evidence, such as it was, was to the contrary, as witness the language with which Williams notified Richards that he had borrowed the $3,500:

"Now, Dick, how I got the money is the hardest part for me to tell. You may be angry, but I didn't do it with any selfish motive, or try to take advantage of the kindness you did for me."

[3] If it appeared from a special finding, or otherwise, that the jury's verdict was based on the ground that Richards subsequently ratified the act of Williams, we might pass over this assignment of error as harmless; but, the verdict being general, we cannot say that the erroneous instruction so given did not affect the result.

The judgment is reversed, and the cause is remanded for a new trial.